# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **COLORMASTERS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-06-S-347-M** |
| | ) | |
| **FLINT INK NORTH AMERICA,** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Colormasters, LLC ("Colormasters"), originally brought this action

in the Circuit Court of Marshall County, Alabama.  Colormasters asserted state law

claims for a declaratory judgment and breach of contract against defendant, Flint Ink

North America Corporation ("Flint Ink").  Both of these claims arise out of a Supply

Agreement entered into between Colormasters and Flint Ink for the purchase of ink.[1]

Flint Ink subsequently removed the case to this court, asserting jurisdiction based on

satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332(a)(1).[2]  Flint

---

[1] *See* Complaint, appended to doc. no. 1 (Notice of Removal).

[2] Doc. no. 1 (Notice of Removal).  Colormasters is "a limited liability company organized and existing pursuant to the laws of the State of Alabama."  Complaint, at ¶ 1.  Flint Ink is a Michigan corporation with its principal place of business in Michigan.  Notice of Removal, at ¶ 6. Colormasters' complaint seeks damages in excess of the $75,000 jurisdictional threshold.  *See, e.g.,* Complaint, at ¶¶ 11-14 (seeking compensation for $125,000 of "work off ink," and damages for production delays, downtime, lamination and qualification problems, and return of products from a customer).

Ink also asserted a counterclaim for breach of contract against Colormasters.[3]  The case currently is before the court on Flint Ink's motion for summary judgment on the claims asserted in Colormasters' complaint,[4] and Flint Ink's motion for summary judgment on its own counterclaim against Colormasters.[5]

## PART ONE

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment always bears the initial responsibility of informing the court, by reference to materials on file, that there are no genuine issues

---

[3]*See* doc. no. 3 (Answer), at 6-9.

[4]Doc. no. 12.

[5]Doc. no. 13.

of material fact to be decided at trial. *Id*. at 323; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the moving party to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324.

When the moving party has discharged its burden, the non-moving party cannot rest upon the pleadings; rather, Fed. R. Civ. P. 56(e) requires the party opposing summary judgment to go beyond the pleadings, and to demonstrate by affidavit or other appropriate means that there is a genuine issue of material fact for trial. *See also Celotex*, 477 U.S. at 324; *Jeffery*, 64 F.3d at 593-94.

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

Because cross motions for summary judgment are presented, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure:  Civil 3d* § 2720, at 335-36 (1998) (footnote omitted).  *See also*, *e.g.*, *Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986).  Further, the court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico*, *Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## PART TWO

### *Summary of Facts*

Colormasters is in the business of manufacturing and selling flexible products, including plastic bags, in its Albertville, Alabama facility.[6]  Flint Ink is in the business of manufacturing and supplying ink and coating products to various customers.[7]

---

[6]Complaint, at ¶ 1.  *See also* doc. no. 15 (defendant's evidentiary submission), Exhibit C (Deposition of Dennis Hicks), at 9-10.

[7]Complaint, at ¶ 4.

On February 13, 2003, Colormasters and Flint Ink entered into a Supply Agreement ("the Agreement" or "the Supply Agreement"), by which Colormasters agreed to purchase, and Flint Ink agreed to provide, "[n]ot less than the greater of $1,000,000 or 95% of Colormasters' total annual printing requirements . . . ."[8] The Agreement was to remain in effect for a period of four (4) years, and would be automatically renewed for consecutive one-year periods thereafter unless terminated by either party in accordance with the following provision:

> Either party may terminate this Agreement in the event the other party materially fails to perform as required hereunder by giving the other party written notice of such failure to perform, hereinafter called a "Notice of Default." However, the breaching party shall have ninety (90) days from the date of the Notice of Default to rectify the default. In the event the breaching party fails to completely rectify the default within such ninety (90) day period, the non-breaching party may immediately terminate this Agreement. Both parties must act in good faith to resolve any performance issues.[9]

The Agreement also included the following provisions addressing the issues of warranties, limitation of liability, and indemnity:

(A)    <u>Warranty</u> – Flint Ink warrants that the Products will meet written specifications and changes jointly approved by both parties. In the event of a failure of any Product to meet such specifications, Flint Ink's obligation shall be limited to refund or replacement of the Product. THERE ARE NO OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING SPECIFICALLY ANY

---

[8]Doc. no. 15 (defendant's evidentiary submission), Exhibit D (Supply Agreement), at § 1.1(A).

[9]*Id.* at § 4.1.

IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A SPECIFIC PURPOSE.

(B)    <u>Limitation of Liability</u> – In no event shall Flint Ink be liable to Colormasters for any other claims, regardless of the form of action, or for any other damages whether direct, indirect, incidental, special or consequential, including but not limited to, lost business and lost profits, whether foreseeable or not, even if Flint Ink has been advised of the possibility of such damages.

(C)    <u>Indemnity</u> – Colormasters agrees to indemnify and hold Flint Ink harmless from and against any claim made by any third party which arises from or is in any way connected with the Products, the performance by Flint Ink of its obligations hereunder, or the performance of any services by Colormasters. The obligations of Colormasters under this Section shall survive any termination of this Agreement.[10]

The Agreement also addressed the provision of technical support. Flint agreed to "provide the required product development and technical support necessary to help Colormasters remain competitive and service its customers."[11] The technical services provided were to "go beyond the level of expertise typically held by press service personnel."[12]   During the first eighteen months the Agreement was in place, Colormasters could choose to either (1) use two Graphic Technicians employed by Flint Ink at no charge to Colormasters, or (2) use its own Graphic Technicians and

---

[10]*Id.* at § 1.5 (emphasis in original).

[11]*Id.* at § 2.3.

[12]*Id.*

invoice Flint Ink for their services.[13]   After eighteen months, Colormasters could either continue to use Flint Ink's Graphic Technicians and pay for their services, or use its own Graphic Technicians at its own cost.[14]   Graphic Technicians are Flint Ink employees who work on a customer's job site to mix inks, match ink colors, and perform minor adjustments to operating equipment.[15]

Colormasters also agreed to purchase certain equipment from Flint Ink, with the cost of acquisition to be financed as follows:

> Flit Ink shall issue a credit memo in the amount of One Hundred Seventy-Five Thousand Dollars ($175,000.00) for the purchase of selected equipment.  The equipment credit shall be issued based on a minimum of five million five hundred thousand dollars ($5,500,000.00) in product purchases by Colormasters from Flint Ink over the four year term of this agreement.  Failure to meet this purchase requirement or termination of the agreement by either party will be resolved according to Section[] 4.2 . . . of this agreement.[16]

Section 4.2 states, in pertinent part, that if the Agreement is terminated,

> Colormasters will repay the non-depreciated portion of the one hundred seventy five thousand dollar equipment credit based on net purchases from Flint Ink through the date of termination.  The calculation will be based on actual net product purchases from Flint Ink as a percentage of the minimum Five million five hundred thousand dollar requirement of this agreement.  Colormasters will repay an amount equal to the same

---

[13]*Id.* at § 2.2(A).

[14]*Id.* at §2.2(B).

[15]Doc. no. 20 (defendant's evidentiary submission), Exhibit F (Deposition of Bill Barton), at 16-18.

[16]Supply Agreement, at § 3.1.

percentage of the one hundred seventy five thousand dollar equipment credit within thirty days of the date of termination.[17]

The Agreement also states that, upon termination, "[a]ll remaining Consigned Goods or outstanding purchase orders for Products shall be billed to and paid by Colormasters in accordance with Section 1.5."[18] The court assumes the reference to Section 1.5 is incorrect, and that the intended reference was to Section 1.4, which provides that payment for all goods sold under the Agreement is due within fifty days from the date of invoice.[19] The Agreement is explicit that, "[i]n no event shall Colormasters deduct from outstanding invoices pending claims or claims settlements without the prior consent of Flint Ink."[20] The Agreement also provides that it embodies "the entire agreement of the parties hereto with respect to the purchase and sale of ink and supersedes all prior agreements with respect thereto."[21] The

---

[17]*Id.* at § 4.2(B).

[18]*Id.* at § 4.2(A). The Agreement describes "Consigned Goods" as "sufficient selected or specific Products to meet the requirements of Colormasters . . . on a consignment basis," which are to be held in consigned goods storage at Colormasters' facilities. *Id.* at § 1.3. The Consigned Goods are to "be treated as sold on a monthly basis and accordingly invoiced based upon consigned goods consumed during the month. Consigned Goods consumed shall include all open containers of Products in place at the end of each such month and Consigned Goods remaining on the floor for a period of sixty (60) days or more." *Id.* at § 1.3(A). "Flint Ink shall continue to be the owner of the Consigned Goods and hold legal title to same until such time as the earlier of when Colormasters uses the Consigned Goods or pays Flint Ink in full for them." *Id.* at § 1.3(B).

[19]*Id.* at § 1.4. Section 1.5 contains the warranty, limitation of liability and indemnity provisions referenced above. *See supra* pages 5-6 (text accompanying footnote 10).

[20]*Id.* at § 5.8.

[21]*Id.* at § 5.3.

Agreement may be amended or waived "only in writing signed by the party against whom such amendment or waiver is sought to be enforced."[22]  Finally, the Agreement is to be "governed by and construed in accordance with the laws of the State of Michigan."[23]

As early as November of 2004, the relationship between Colormasters and Flint Ink began to deteriorate.  On November 16, 2004, Bill Barton, Flint's Southeast Regional Manager,[24] sent a letter to Gus King at Colormasters, providing notice of Colormasters' alleged default of the Supply Agreement.[25]  The alleged default was "based on Colormasters' failure to meet either the ninety five percent (95%) or one million dollar ($1,000,000) annual purchase commitment and failure to make a 'good faith' effort to approve Flint Ink products for applications that would allow Colormasters to meet the purchase requirements of the Agreement."[26]  Flint Ink stated that, if Colormasters did not cure the default within ninety days as provided in the Agreement, it would terminate the Supply Agreement and expect Colormasters' full compliance with the post-termination provisions of the Agreement.[27]  Specifically,

---

[22]*Id.*

[23]*Id.* at § 5.6.

[24]*See* Barton Deposition, at 7-8.

[25]Hicks Deposition, at Exhibit 3 (November 16, 2004 letter).

[26]*Id.* at 1.

[27]*Id.*

Colormasters will be invoiced for the non-depreciated portion of the one hundred seventy five thousand dollar ($175,000) Equipment Credit based on net ink purchases from Flint Ink through the date of termination. The calculation will be based on the actual net product purchases from Flint as a percentage of the minimum five million five hundred thousand dollar ($5,500,000) purchase requirement over the term of the Agreement. In signing the Agreement, Colormasters agreed to repay an amount equal to the same percentage of the $175,000 Equipment Credit within thirty (30) days of the date of termination.[28]

Flint Ink also informed Colormasters it would be invoiced for "the salary and benefits cost of the two Graphic Technicians (GT's) now on site with payment terms of fifty (50) days."[29]

Colormasters replied on December 1, 2004, by means of a letter signed by Dennis Hicks, its managing member.[30] Hicks agreed that "it is probably in the best interest of both of our companies if the current contract is terminated."[31] Hicks claimed, however, that Flint Ink was the party in breach of the Supply Agreement, citing the poor performance of Flint's Graphic Technicians and the resulting creation of "over $100,000.00 in work off ink," as well as production down time resulting in "several hundreds of thousands of dollars" in losses.[32] Hicks proposed that the contract be terminated, under the following conditions: (1) that the non-depreciated

---

[28]*Id.*

[29]*Id.* at 2.

[30]*See* Hicks Deposition, at 10.

[31]Hicks Deposition, Exhibit 4 (December 1, 2004 letter), at 1.

[32]*Id.*

portion of the $175,000.00 Equipment Credit would be offset "for some or all of the amount owing based on the exorbitant amount of work off ink created by the [Graphic Technicians]"; (2) that Colormasters would not be required to pay the salary or benefit costs of the Graphic Technicians; and (3) that both companies would release each other from any further obligations under the Agreement, and from any potential claims.[33]

Despite the exchange of these letters, however, the Agreement was not immediately terminated by either party. Instead, in February of 2005, Flint Ink sent Randy Pruitt, a technical advisor, to work at the Colormasters facility in an effort to bring Flint's products in compliance with Colormasters' requirements.[34] These efforts continued for several months, but Colormasters still was not satisfied with the quality of the ink.[35] Therefore, on August 22, 2005, Colormasters entered into a contract with Sun Chemical, a competitor of Flint Ink, to purchase ninety-five percent of its ink requiremnets from Sun Chemical.[36] The only reason Colormasters began to purchase ink from Sun Chemical is that Flint's products did not meet

---

[33]*Id.* at 1-2.

[34]Doc. no. 30 (plaintiff's evidentiary submission), Exhibit D (Deposition of Randy Pruitt), at 21-25.

[35]Hicks Deposition, at 58.

[36]*Id.* at 154-56; *id.,* Exhibit 14, at 1.

Colormasters' requirements.[37]   Sun Chemical also agreed to give Colormasters a
$150,000.00 credit to be used for the buyout of its current supply contract with Flint
Ink.[38]   Colormasters received the benefit of that credit, but it never tendered any of
the money to Flint Ink.[39]

Dennis Hicks wrote to Bill Barton on October 31, 2005, informing him that
Colormasters "consider[ed] the contract to be null and void and in breach due to the
poor products and services" rendered by Flint Ink.[40]   Hicks acknowledged Flint Ink's
efforts to correct the problems that had surfaced, but emphasized that "nothing has
been solved."[41]   Hicks outlined the existing problems as follows:

> As we have discussed on many, many occasions, we have over
> $125,000.00 in work off ink.  That is unacceptable.  Also, we continue
> to have major qualification problems[42] with the ink.  The qualification
> issues alone have caused tremendous losses to our facility.
>
> Instead of getting better, the problems have persisted.  Just
> recently we have had several major problems pertaining to your
> Company's inks.  We received a claim from a major customer that
> resulted in the return of 500,000 bags.  This claim was due to bad Flint

---

[37]Hicks Deposition, at 56.

[38]*Id.*

[39]*Id.* at 156.

[40]Hicks Deposition, Exhibit 11 (October 31, 2005 letter), at 1.

[41]*Id.*

[42]"Qualification" refers to the process of testing and reformulating Flint's ink products in order to ensure that they met Colormasters' requirements.  Barton Deposition, at 111-12.  In this context, Flint Ink had to demonstrate that its products performed at least as well as Sun Chemical's. *Id.*

-12-

ink that was mixed by Flint Ink technicians and as a result, we lost a major customer that could have exceeded $1,000,000 per year in purchases from Colormasters.  We have had cancelled orders and returned products from other customers that already exceed $119,000 — claims that your salesman has been made aware of.  We have a new customer that is requesting a credit of $13,000 for an entire run that had ink problems.  There are numerous other losses and problems.[43]

Hicks proposed the following solution:

> 1.   Flint Ink will compensate us for the amount of work off ink we currently have, as well as for the losses we sustained as outlined above.
>
> 2.   Both companies will enter into a mutual release releasing the other from any and all obligations and duties arising from the contract, as well as any and all claims or potential claims pertaining thereto.[44]

Bill Barton responded on November 15, 2005.[45]  As the text of Barton's letter is essential to some of the parties' summary judgment arguments, it will be quoted in full:

> Dear Dennis:
>
> We are writing in response to your letter of October 31, 2005 relating to our Ink Supply Contract and your proposal to terminate our current Agreement.  Your letter sites [sic] a number of reasons for your proposal including Work Off Inventory and several instances claiming significant monetary losses to Colormasters.  However, you provide no specific information identifying or documenting these losses that allows

---

[43]Hicks Deposition, Exhibit 11 (October 31, 2005 letter), at 1.

[44]*Id.* at 2.

[45]Hicks Deposition, at Exhibit 15.

us to investigate such claims.  For the purposes of this response and for future reference, we have addressed each of your general claims in the following categories:

**Work Off Inventory** — you site [sic] $125,000 as a level of Work Off inventory and request payment from Flint Ink in that amount.  By such a request you are treating these materials as a loss to Colormasters when in actually [sic] it is active inventory held in your facility.  Within your operation the term "Work Off" is assigned to all inks returned from the Press and due to the minimum amount of ink required to fill Press fountains or reservoirs at least five to ten gallons is generated with each color change.   This inventory also contains inks that have been contaminated due to inadequate Press clean up of previous colors by your Press Operators.  Additionally, this inventory represents colors from designs you no longer print or by the nature of their color shades, are difficult or impossible to blend with active inks for the most economical consumption.  We are not certain if the dollar amount claimed represents competitive inks, but know there is a significant amount contained in your inventory. Whether included or not, we believe much of this ink has been purchased in violation of our current Supply Agreement.  It is factual that our on-site personnel assist in working these inks returned from the Press into active colors, but this task also falls on your personnel who man other shifts in the ink room.  All of the above facts plus other variables, including accounting practices to assign value to these inks, contribute to the poundage and dollar value of "Work Off" inks that exist in your inventory. It is because of these known variables that Flint Ink, neither contractually nor by implied practices ever accepted responsibility for maintaining arbitrary levels of your working inventories.

**Product Loss Claims** — you site [sic] dollar amounts of $119,000 and $13,000 as both lost materials and canceled orders relating to our inks, but no specific jobs, designs, customers or documentation is provided.  You also indicate that our Salesman

-14-

has been made aware of all such problems, but I find that other than a customer complaint covered in a letter from your Ms. Glenda Swanson dated September 1, 2005, no Flint Ink personnel is aware of any ink related losses experienced by Colormasters. In regard to Glenda's letter, she advised of a "quite perturbed" customer relating to ink peeling off of packages printed with a Labanderita brand Tortilla Shell design.[46] As pointed out in my response dated November 14, 2005, we had not replied in writing earlier because her letter was general in its description of the problem and we had been later told by your production management that it was not an ink problem.  It was not until receipt of your letter that we heard anything to contradict that assessment.  Additionally, after receiving Glenda's letter, we did proceed with testing the complaint bags and found high levels of retained solvents present which typically occurs due to insufficient drying and will produce the type problem described in her letter.  The results of this testing were reviewed with your Mr. Randy Pruitt.

I'm sure you are aware that contractually we do not accept liability for potential lost business due in-part to the difficulties of establishing such values.  *We do stand behind our products*

---

[46]The text of the letter from Glenda Swanson to Bill Barton is as follows:

Bill I [sic] have enclosed a package of Labanderita brand tortilla shells for you to look at.  The ink is obviously a problem.  These are in grocery stores and our customer is quite upset at the appearance of the packages, as well you can understand since the ink is peeling off, which gives the package an appearance of bad product.

Our customer is quite perturbed and I can fully appreciate their reaction.  Not only has this customer pulled all orders we have in-house and that is very detrimental to Colormasters, but we will have to issue credits and pay freight charges for delivery and for bringing bags back to our facility, plus whatever damage they may claim.  Just wanted you to be aware of this problem and the on going effects it may have.

If you have any further questions please let me know, and I will keep you up to date on any future developments.

Hicks Deposition, at Exhibit 10.

> *and are always open to review problems where it's shown that we*
> *have provided a product that does not meet established standards*
> *and are certainly willing to discuss material losses where it's*
> *shown that Flint Ink has failed to meet such standards.*

From the information you have provided, Flint Ink does not accept any financial liability as outlined in your letter. We do agree that the interest of both companies is best served by terminating our Agreement and believe you have violated the terms of our existing Contract by entering into a new supply arrangement with Sun Chemical. We therefore accept your consideration of having the existing Contract terminate as of October 31, 2005, but expect you to honor the Termination Clause of our Contract in accordance with the following:

**Equipment Credit** – as part of the current Contract, Flint Ink issued a Credit for $175,000 to be used for equipment purchases. This Credit was issued based on Colormasters commitment to purchase $5,500,000 in ink products during the four year term of the Agreement. The Contract also provides a formula for calculating a prorated reimbursement for this Credit based on Colormaster net purchases through the termination date Vs [sic] the $5,500,000 comittment [sic] should the Contract terminate prior to its full term. Your purchases from March 1, 2003, the commencement date of the Contract, through October 31, 2005 total $1,556,934, a shortfall of $3,943,066 or 71.7% of your commitment. Based on the provided formula and the terms of the Contract, 71.7% of the $175,000 requires Colormasters to pay Flint Ink $125,475 within 30 days of the receipt of the enclosed invoice.

**Graphic Technician (GT), In-Plant Staffing** – Under the terms of the Contract Flint Ink agreed to furnish two [Graphic Technicians] at it's [sic] expense for the first eighteen months of the Contract. Thereafter, Colormasters agreed to reimbursement [sic] Flint Ink $8,333.34 per month should these [Graphic Technicians] remain on-site. Based on the agreed upon time

schedule, Colormasters owes Flint Ink $108,333.42 which is payable within 50 days of receipt of the enclosed invoice.

**Open Invoices** – Colormasters is obligated to pay all unpaid invoices within the 50 day term set forth in the Contract.

As stated above, *Flint Ink stands behinds [sic] its products and agrees to discuss any and all product claims with specific loss information where Flint Ink is shown to have provided non-standard products.* For the purposes of terminating the current Contract, however, we expect full payment of the above amounts within the terms of the Agreement. Please advise if we need to discuss any remaining details and we will make arrangement to meet at your convenience.[47]

Colormasters declined those terms and instead proposed that Flint Ink compensate it for all of the alleged work off ink, and that the two companies' separation otherwise would amount to a "complete wash."[48] Flint Ink apparently declined to accept that arrangement, because Colormasters commenced this suit on January 20, 2006.[49]

It is undisputed that Flint Ink has issued invoices to Colormasters that Colormasters has not yet paid.[50] These invoices include charges for ink that never

---

[47]Hicks Deposition, at Exhibit 15 (boldface emphasis in original, italicized emphasis supplied).

[48]Hicks Deposition, at Exhibits 16 and 17 (letters dated November 22, 2005 and December 5, 2005).

[49]*See* doc. no. 1 (Notice of Removal), and attached complaint.

[50]Hicks Deposition, at 50-51; doc. no. 15 (defendant's evidentiary submission), Exhibit E (Deposition of Ruben Fryer), at 51.

met Colormasters' standards.[51]  David Hicks acknowledges that Colormasters owes Flint Ink money under these invoices, but testified that Colormasters has not paid the invoices because it believes Flint Ink owes it a monetary sum greater than the amount due under the invoices.[52]  The total amount of the outstanding invoices is at least $151,023.22.[53]  It also is undisputed that no portion of the $175,000 equipment credit has been repaid to Flint Ink.[54]

**PART THREE**

*Summary of the Parties' Claims*

Colormasters asserted two claims in the complaint filed in state court, but subsequently removed: *i.e.,* one for a declaratory judgment and one for breach of contract.  For its declaratory judgment claim, Colormasters asks the court to determine:

A.    That the Contract has been breached by the actions of Flint Ink, by, among other things:

    1.    The creation by Flint Ink and/or its' [sic] [Graphic Technicians] of $125,000.00 of "work off ink" outlined above;

    2.    The failure and refusal of Flint Ink to properly remedy,

---

[51]Pruitt Deposition, at 243.

[52]Hicks Deposition, at 65.

[53]Fryer Deposition, Exhibit 2, at document bearing Bates Stamp No. PID0012.

[54]Fryer Deposition, at 17.

pay, credit, remove or cause to be removed the "work off ink";

3.    The creation by Flint Ink and/or its' [sic] [Graphic Technicians] of numerous production delays and substantial downtime in Colormasters' business as outlined above;

4.    The failure and refusal of Flint Ink to pay or properly credit Colormasters for the substantial losses, expenses and damages Colormasters has incurred as a result of the production delays and downtime Flint Ink and/or its' [sic] [Graphic Technicians] caused;

5.    The creation by Flint Ink and/or its' [sic] [Graphic Technicians] of the lamination and/or qualification problems outlined above;

6.    The failure and refusal of Flint Ink to pay or properly credit Colormasters for the substantial losses, expenses and damages Colormasters has incurred as a result of the lamination and/or qualification problems caused by Flint Ink and/or its' [sic] [Graphic Technicians];

7.    The creation by Flint Ink and/or its' [sic] [Graphic Technicians] of the claim from Colormasters' customer resulting in the return to Colormasters of approximately 500,000 printed packaging bags as outlined above. [sic]

8.    The failure and refusal of Flint Ink to pay or properly credit Colormasters for the substantial losses, expenses and damages Colormasters has incurred as a result of such claim; and/or

9.    By Flint Ink's failure and refusal to honor the guarantees made to Colormasters at the face to face meeting described above, namely:

a.   That a qualified [Graphic Technician] would be installed at Colormasters' Albertville, Alabama facility;

b.   That Flint Ink's products would be corrected and would be in proper order prior to the installation of a new press Colormasters had acquired;

c.   That Flint Ink would stand behind its' [sic] products and services;

d.   That Flint Ink would satisfy the "work off ink" problem;

e.   That corrective steps and measures would be taken by Flint Ink to prevent future "work off ink" build-up;

f.   That Flint Ink would take the steps and measures necessary to solve the issues pertaining to the lamination and qualification problems; and/or

g.   That Flint Ink's products would run as fast as those of Sun Chemical — a competitor of Flint Ink.

B.   That due to the actions of Flint Ink, Colormasters has been caused to suffer compensable damages.

C.   That Colormasters is not indebted or liable to Flint Ink for any sums of money.

D.   That Colormasters is entitled to such further, other or different orders, judgments, relief and decrees as may be necessary and proper to give effect to the rights and duties and liabilities of the parties as determined and declared by the Court.[55]

---

[55]Complaint, at 8-11.

For its breach of contract claim, Colormasters alleged that Flint Ink breached the

Supply Agreement by:

A.   The creation by Flint Ink and/or its' [sic] [Graphic Technicians]
     of $125,000.00 of "work off ink" outlined above;

B.   The failure and refusal of Flint Ink to properly remedy, pay,
     credit, remove or cause to be removed the "work off ink";

C.   The creation by Flint Ink and/or its' [sic] [Graphic Technicians]
     of numerous production delays and substantial downtime in
     Colormasters' business as outlined above;

D.   The failure and refusal of Flint Ink to pay or properly credit
     Colormasers for the substantial losses, expenses and damages
     Colormasters has incurred as a result of the production delays and
     downtime Flint Ink and/or its' [Graphic Technicians] caused;

E.   The creation by Flint Ink and/or its' [Graphic Technicians] of the
     lamination and/or qualification problems outlined above;

F.   The failure and refusal of Flint Ink to pay or properly credit
     Colormasters for the substantial losses, expenses and damages
     Colormasters has incurred as a result of the lamination and/or
     qualification problems caused by Flint Ink and/or its' [sic]
     [Graphic Technicians];

G.   The creation by Flint Ink and/or its' [sic] [Graphic Technicians]
     of the claim from Colormasters' customer resulting in the return
     to Colormasters of approximately 500,000 printed packaging bags
     as outlined above. [sic]

H.   The failure and refusal of Flint Ink to pay or properly credit
     Colormasters for the substantial losses, expenses and damages
     Colormasters has incurred as a result of such claim; and/or

I.    By Flint Ink's failure and refusal to honor the guarantees made to Colormasters at the fact [sic] to face meeting described above, namely:

     1.    That a qualified [Graphic Technician] would be installed at Colormasters' Albertville, Alabama facility;

     2.    That Flint Ink's products would be corrected and would be in proper order prior to the installation of a new press Colormasters had acquired;

     3.    That Flint Ink would stand behind its' [sic] products and services;

     4.    That Flint Ink would satisfy the "work off ink" problem;

     5.    That corrective steps and measures would be taken by Flint Ink to prevent future "work off ink" build-up;

     6.    That Flint Ink would take the steps and measures necessary to solve the issues pertaining to the lamination and qualification problems; and/or

     7.    That Flint Ink's products would run as fast as those of Sun Chemical — a competitor of flint Ink.[56]

To remedy this alleged breach, Colormasters requests an award of monetary damages, costs, and attorney fees.[57]

In its counterclaim, Flint Ink alleges that Colormasters breached the Supply Agreement by: (1) replacing Flint Ink as its supplier of ink and repudiating its

---

[56]*Id.* at 11-14.

[57]*Id.* at 14.

obligation to have all of its ink requirements fulfilled by Flint Ink; (2) failing to act in good faith to resolve performance issues; (3) refusing to pay, upon termination of the Agreement, the outstanding invoices or the non-depreciated portion of the $175,000 equipment credit; and (4) withholding payment of the outstanding invoices based on admitted pending claims without Flint Ink's consent.[58]  As a result, Flint Ink requests a judgment against Colormasters in the amount of $163,134.58 for outstanding invoices, and $125,475.00 for the equipment credit, together with lost profits, incidental and consequential damages, interest, costs, attorney's fees, and expenses.[59]

**PART FOUR**

*Discussion of Summary Judgment Motions*

**A.**    *Plaintiff's Abandonment of its Declaratory Judgment and Breach of Oral Promises Claims*

At the summary judgment stage, Colormasters effectively abandoned its claims for a declaratory judgment and breach of oral promises.  Colormasters has offered no response to defendant's well-supported arguments that summary judgment should be granted on those claims.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing

---

[58]Doc. no. 3 (Answer), at 8.

[59]*Id.* at 8-9.

summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc*., 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

**B.**   *Summary Judgment on Plaintiff's Breach of Express Contract Claim*

To support a claim for breach of an express, written contract under Michigan law, Colormasters must prove three elements:  the existence of a contract; Flint Ink's breach of the contract; and damages resulting from that breach.  *See, e.g., In re Brown,* 342 F.3d 620, 628 (6th Cir. 2003) (citing *Platsis v. E.F. Hutton & Co., Inc.,*

642 F. Supp. 1277, 1309 (W.D. Mich. 1986)) (applying Michigan law).  Flint Ink argues that Colormasters cannot prevail on its breach of contract claim because is not entitled to any of the damages it has requested.[60]

Flint Ink's primary points are that the Supply Agreement limits its liability to damages for breach of express warranty, and that Colormasters has no evidence to support a claim for breach of express warranty.  Indeed, the Supply Agreement includes an express warranty that Flint Ink's products "will meet written specifications and changes jointly approved by both parties," and explicitly disclaims all other warranties, express or implied.[61]  In the event of a breach of the warranty, Flint Ink's "obligation shall be limited to refund or replacement of" any product that does not meet written specifications.[62]

Colormasters does not dispute that it failed to produce any evidence to support a claim for breach of express warranty.[63]  Colormasters has failed to identify any

---

[60]*See* doc. no. 14 (defendant's summary judgment brief), at 11 ("Even assuming Flint breached the Agreement when construing all of the facts in a light most favorable to Colormasters, which it did not, Colormasters is not entitled to any of the damages it has claimed.").

[61]Supply Agreement, at § 1.5(A).

[62]*Id.*

[63]Flint Ink also argues that Colormasters has not even *asserted* a claim for breach of express warranty.  Considering Colormasters' claims in the light most favorable to it, however, the court concludes that Colormasters did assert such a claim.  *See, e.g.,* Complaint at ¶¶ 7(A)-(D) (referring to the "poor and substandard quality" of Flint Ink's products).  Colormasters is emphatic on this point in its brief.  *See* doc. no. 22 (plaintiff's brief), at 15 (calling Flint Ink's argument that Colormasters failed to even assert a breach of express warranty claim "absurd").  However, it offers no response to Flint Ink's argument that Colormasters failed to produce evidence to support a breach

written specification or change jointly approved by the parties, much less any specific ink products that failed to meet a written specification.[64]   Further, even if Colormasters had identified any non-conforming ink products, its remedy would be limited by the contract to a refund of the amounts paid for, or replacement of, that particular ink product.  There is no evidence that Colormasters ever made a claim for refund or replacement of a product.  There also is no evidence to demonstrate the amount of Flint ink that allegedly was defective, and no evidence of how to identify the allegedly defective ink products, as opposed to ink products that worked properly.  Finally, there is no evidence of the amount Colormasters paid Flint Ink for any products that allegedly were defective.  Ruben Fryer, Colormasters' controller, testified that he did not know "the cost to Colormasters in terms of ink for each one" of the jobs in which the allegedly defective ink caused production problems.[65]

Accordingly, because Colormasters has no evidence to support a claim for breach of express warranty, summary judgment is due to be granted on that aspect of its breach of contract claim that is founded upon an alleged breach of an express warranty.

Further, the Supply Agreement precludes any claims other than those founded

---

of express warranty claim.

[64]*See, e.g.,* Fryer Deposition, at 22-23.

[65]Fryer Deposition, at 22.

upon a breach of express warranty, and prohibits any remedy other than refund or replacement. Immediately after describing Flint Ink's liability for breach of express warranty, the Supply Agreement clearly states that,

> [i]n no event shall Flint Ink be liable to Colormasters *for any other claims*, regardless of the form of action, or *for any other damages* whether direct, indirect, incidental, special or consequential, including but not limited to, lost business and lost profits, whether foreseeable or not, even if Flint Ink has been advised of the possibility of such damages.[66]

Limitation of liability provisions such as this one are permitted by Michigan law. *See* Mich. Comp. Laws § 440.2719 (1979) (stating that parties may agree to "limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts").[67]   Thus, Flint Ink argues that

---

[66]Supply Agreement, at § 1.5(B) (emphasis supplied).

[67]The text of § 440.2719 states in full:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages

    (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

    (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.

Colormasters' claims for work-off ink, production delays, lamination and qualification problems, return of bags from a customer, and lost profits are "other claims" requesting "other damages," and they are therefore precluded by the Supply Agreement.

Flint Ink's argument is consistent with the plain language of the Supply Agreement. *See, e.g., Powers v. Apcoa Standard Parking, Inc.,* 259 F. Supp. 2d 606, 609 (E.D. Mich. 2003) (citing *Schroeder v. Terra Energy, Ltd.,* 565 N.W. 2d 887, 891 (1997)) ("Generally, the language of a contract is interpreted according to its plain and ordinary meaning."). Further, Colormasters does not dispute that the limitation of liability provision is valid, or that the provision would preclude claims for damages other than refund or replacement of a non-conforming product, *insofar as those claims relate directly to the ink products sold pursuant to the Supply Agreement.*

Colormasters argues, however, that all of the damages it suffered were caused by the Graphic Technicians' failure to properly perform their job duties, and that the Supply Agreement does not "preclude Colormasters' damage claims when such

---

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Mich. Comp. Laws § 440.2719 (1979).

-28-

damages were caused by the [Graphic Technicians'] [sic] actions or inactions."[68] Specifically, Colormasters points to Section 2.3 of the Supply Agreement, which states: "Flint Ink shall provide the required product development and technical support necessary to help Colormasters remain competitive and service its customers. These services go beyond the level of expertise typically held by press service personnel."[69]  Colormasters claims that this provision created an "express service warranty," pursuant to section 440.2313(1)(a) of the Michigan Commercial Code, that "Flint Ink's technical help will have a greater expertise than Colormasters' employees, and that they will use such expertise to help Colormasters remain competitive and service its' [sic] customers."[70]

The statutory provision relied upon by Colormasters states that "[a]n affirmation of fact or promise made by the seller to the buyer which relates to *the goods* and becomes part of the basis of the bargain creates an express warranty that *the goods* shall conform to the affirmation or promise."  Mich. Comp. Laws § 440.2313(1)(a) (1979) (emphasis supplied).[71]   The Michigan Commercial Code

---

[68]Plaintiff's brief, at 16.

[69]Supply Agreement, at § 2.3.

[70]Plaintiff's brief, at 17.

[71]The cited statutory provision states in full:

(1) Express warranties by the seller are created as follows:

   (a) An affirmation of fact or promise made by the seller to the buyer which

defines "goods" as

> all things (including specially manufactured goods) which are movable
> at the time of identification to the contract for sale other than the money
> in which the price is to be paid, investment securities . . . and things in
> action. "Goods" also includes the unborn young of animals and growing
> crops and other identified things attached to realty as described in the
> section on goods to be severed from realty . . . .

Mich. Comp. Laws § 440.2105(1) (1979).  The services provided by Flint Ink's
Graphic Technicians are not movable things and therefore cannot be considered
"goods" under the Michigan Commercial Code.  Because the services of the Graphic
Technicians are not "goods," any representation made by Flint Ink about those
services did not create an express warranty under § 440.2313(1)(a).  If there is no
express warranty about the Graphic Technicians' services, plaintiff offers no
explanation — and the court can discern no plausible one —  why plaintiff's claims

---

relates to the goods and becomes part of the basis of the bargain creates an express
warranty that the goods shall conform to the affirmation or promise.

  (b) A description of the goods which is made part of the basis of the bargain
creates an express warranty that the goods shall conform to the description.

  (c) A sample or model which is made part of the basis of the bargain creates
an express warranty that the whole of the goods shall conform to the sample or
model.

(2) It is not necessary to the creation of an express warranty that the seller use formal
words such as "warrant" or "guarantee" or that he or she have a specific intention to
make a warranty, but an affirmation merely of the value of the goods or a statement
purporting to be merely the seller's opinion or commendation of the goods does not
create a warranty . . . .

Mich. Comp. Laws § 440.2313 (1979).

about the Graphic Technicians' services are not barred by the limitation of liability provision in the Supply Agreement.

Colormasters also argues that Bill Barton's November 15, 2005 letter to Dennis Hicks created either "a new and distinct warranty agreement," or a modification of the existing warranty.[72]   Specifically, Colormasters relies upon the following statements: (1) "Flint Ink stands behinds [sic] its products"; (2) Flint Ink is "always open to review problems where it's shown that we have provided a product that does not meet established standards"; and (3) Flint Ink is "certainly willing to discuss material losses where it's shown that Flint Ink has failed to meet such standards."[73]

Colormasters again relies upon Section 440.2313 of the Michigan Commercial Code, which states, in pertinent part, that "[a]n affirmation of fact or promise made by the seller to the buyer which relates to the goods *and becomes part of the basis of the bargain* creates an express warranty that the goods shall conform to the affirmation or promise."   Mich. Comp. Laws § 440.2313(1)(a) (1979) (emphasis supplied).

> It is not necessary for the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he or she have a specific intention to make a warranty, *but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's*

---

[72]Plaintiff's brief, at 18.  *See supra,* pages 13-17, for the full text of Barton's November 15, 2005 letter.

[73]*See* November 15, 2005 letter, at 2, 3.

> *opinion or commendation of the goods does not create a warranty*,
> except as provided in [code sections not relevant here].

Mich Comp. Laws § 440.2313(2) (1979) (emphasis supplied).   The legislative

comments to § 440.2313 note that "the basic question" underlying both subsection

(1) and subsection (2) is the same, *i.e.,* "What statements of the seller have in the

circumstances and in objective judgment become part of the basis of the bargain?"

Mich Comp. Laws § 440.2313, cmt. 8.

The statements in Bill Barton's November 15, 2005 letter did not create a new

express warranty under this provision of the Michigan Commercial Code, nor did

they amend the existing warranty.   First, there is no indication that Barton's

statements formed "part of the basis of the bargain" between Colormasters and Flint

Ink.  Indeed, "the bargain" between the two companies no longer existed at the time

of the November 15 letter, as Barton agreed with Dennis Hicks' suggestion that the

Supply Agreement be terminated as of October 31, 2005.  As of that date, Flint Ink

should no longer have been supplying any goods to Colormasters under the

Agreement.  Therefore, the letter could not have formed an express warranty, because

there were no goods remaining to be covered under the warranty.

Additionally, the language used by Barton was not of the type that has been

recognized to create an express warranty under Michigan law.  Under the Michigan

Commercial Code and Michigan case law gloss, a seller's opinion about the goods or a statement about their value  does not create a warranty.  Mich. Comp. Laws § 440.2313(2).  *See also Beyette v. Ortho Pharmaceutical Corp.,* 823 F.2d 990, 993 (6th Cir. 1987) (holding that "'[r]epresentations which merely express the seller's opinion, belief, judgment, or estimate do not constitute a warranty'") (quoting *Carpenter v. Alberto Culver Co.,* 184 N.W. 2d 547, 549 (Mich. Ct. App. 1970)).  For example, in *Beyette,* the Sixth Circuit Court of Appeals, applying Michigan law, considered statements that the "estimated" rate of side effect occurrence with use of an intrauterine contraceptive device was the same as the rate without use of the device, and that "more than a million women throughout the world have used this method successfully."  *Beyette,* 823 F.2d at 993.  The court held that an estimate of the product's performance level did not create an express warranty, and that the statement about a million women using the product successfully did not equal a warranty that the product was risk-free.  *Id.*  Further, in *Carpenter,* the Court of Appeals of Michigan found statements by a store clerk that a hair dye product gave her "very nice" and "very natural" hair, that many of her friends had used the product, and that the plaintiff "would get very fine results" with the product did not create an express warranty.  *Carpenter,* 184 N.W. 2d at 549.  *See also Pidock v. Ewing,* 435 F. Supp. 2d 657, 663-64 (E.D. Mich. 2006) (statement on a manufacturer's website that,

-33-

"in addition to safety, performance and convenience, Road Master delivers peace of mind like no other chassis on the market today" did not create an express warranty); *McGhee v. GMC Truck & Coach Division,* 296 N.W. 2d 286, 290 (Mich. Ct. App. 1980) (statement that a used machine was "in good condition," when made in context of sale of the machine to "a knowledgeable buyer" was simply a "general expression of opinion," and did not create an express warranty).

In this, Barton's first statement (*i.e.,* that Flint Ink stands behind its products) represents only his opinion of Flint Ink's general willingness to promote a quality product.  His other statements (*i.e.,* that Flint Ink is open to review problems and willing to discuss material losses when flint's products do not meet established standards) reveal nothing other than Flint Ink's willingness to abide by the Supply Agreement, in which Flint Ink promised to conform its products to existing written specifications.  Barton's letter made no promises or affirmations that had not already been set forth in the Supply Agreement.  It has already been determined that Colormasters cannot support a claim based upon breach of the express warranty contained in the Supply Agreement.  Accordingly, Colormasters is not entitled to damages for breach of a new warranty or other agreement allegedly formed by Bill Barton's November 15, 2005 letter.[74]

---

[74]Because the November 15, 2005 letter did not create a separate warranty agreement, the court need not consider plaintiff's arguments that the new warranty contained an ambiguity, and that

In summary, the Supply Agreement precludes all of Colormasters' damage claims.  Accordingly, summary judgment is due to be granted on all aspects of the breach of contract claim in its complaint.

**C.**     *Summary Judgment on Defendant's Counterclaim*

   **1.**     *Claim for Unpaid Invoices*

Flint Ink first argues that it is entitled to recover at least $151,023.22[75] from Colormasters on unpaid invoices.  Colormasters does not dispute that it has failed to pay invoices totaling $151,023.22 for ink it purchased from Flint Ink.[76]  Colormasters argues, however, that it is not actually required to pay *any* of those invoices because *some* of the ink sold under *some* of the invoices was defective.  Stated differently, Colormasters seeks an offset or credit from the invoice amounts for ink that allegedly was defective.

The parties dispute whether the Supply Agreement allows such a claim.  The

---

the court should consider parol evidence and the parties' course of dealing to resolve that ambiguity. *See* plaintiff's brief, at 20-24.  The court does pause, however, to educate plaintiff's counsel that "[a] word is not ambiguous merely because different dictionary definitions exist." *Twichel v. MIC General Insurance Corp.,* 676 N.W. 2d 616, 622 n.6 (Mich. 2004) (citing *Koontz v. Ameritech Services, Inc.,* 645 N.W. 2d 34, 42 (Mich. 2002)).

   [75]Flint Ink's counterclaim requested damages of $163,134.58 for unpaid invoices. *See* Answer, at 8-9.  In its briefing papers, Flint Ink asserts it is entitled to *at least* the $151,023.22 amount conceded by Colormasters. *See* defendant's initial brief, at 26 n.6 ("While Defendant's counterclaim asserts Colormasters owes it $163,134.58, it is undisputed that Colormasters owes Flint, at a minimum, $151,023.22.").

   [76]*See supra,* pages 17-18.

Agreement clearly states that "[i]n no event shall Colormasters deduct from outstanding invoices pending claims or claims settlements without the prior consent of Flint Ink."[77]  Flint Ink claims that it never gave Colormasters consent to deduct any product claims from unpaid invoices.  In fact, Bill Barton testified that he informed Dennis Hicks that Flint Ink expected to be paid in full for all accounts receivable, and that the issue was "not open for bargaining."[78]   On the other hand, Colormasters asserts that it did have Flint Ink's consent, albeit not in writing, to deduct its claims from the invoice payments.  Dennis Hicks testified that Bill Barton had always allowed Colormasters to take deductions from invoices whenever there was a product claim in the past, and he expected that practice to continue with regard to the present contract.[79]  Based upon this conflicting testimony, the court agrees that a fact dispute exists with regard to whether Colormasters had Flint Ink's consent to deduct product claims from unpaid invoices.[80]

Normally that would preclude summary judgment, but not in this case because Colormasters has no evidence that it is entitled to any such deduction.  Colormasters'

---

[77]Supply Agreement, at § 5.8.

[78]Barton Deposition, at 174.

[79]Hicks Deposition, at 77-81.

[80]Colormasters also argues that the term "prior consent" in Section 5.8 of the Supply Agreement is ambiguous.  *See* plaintiff's brief, at 27-28.  The court disagrees and again points out that a term is not ambiguous simply because it carries two meanings.  *See* note 74, *supra.*  Although the term "prior consent" itself is not ambiguous, a fact dispute does exist regarding whether Colormasters actually received Flint Ink's prior consent.

argument against paying the outstanding invoices essentially is the same as the express warranty aspect of its breach of contract claim: *i.e.,* Flint Ink's products were defective; and Flint should be held liable for the defects. As discussed in Part Four(B), *supra,* Colormasters is limited by the Supply Agreement to a claim for breach of express warranty, and its remedy for defective ink products is limited to a refund for or replacement of the allegedly defective product. Colormasters has failed to produce any evidence identifying the specific Flint Ink products that allegedly were defective, or the amount paid by Colormasters for any of those products. Absent any evidence of the refund or replacement value for any specific, allegedly defective ink products, Colormasters is not entitled to receive any offset or credit.

In summary, it is undisputed that Colormasters owes Flint Ink at least $151,023.22 in unpaid invoices. As Colormasters has no evidence to support a claim for an offset against those invoices, Flint Ink is entitled to receive payment in full. Summary judgment is due to be granted in Flint Ink's favor on that aspect of its breach of contract counterclaim seeking payment of unpaid invoices.

**2.** *Claim for Equipment Credit*

Flint Ink also argues it is entitled to recover $125,475.00 from Colormasters as a reimbursement of the non-depreciated portion of the $175,000.00 equipment credit it issued to Colormasters under the Supply Agreement. The Agreement states

-37-

that, upon termination,

> Colormasters will repay the *non-depreciated* portion of the one hundred
> seventy five thousand dollar equipment credit based on net purchases
> from Flint Ink through the date of termination.  The calculation will be
> based on actual net product purchases from Flint Ink as a percentage of
> the minimum Five million five hundred thousand dollar requirement of
> this agreement.  *Colormasters will repay an amount equal to the same*
> *percentage of the one hundred seventy five thousand dollar equipment*
> *credit* within thirty days of the date of termination.[81]

There is no dispute that Colormasters owes Flint Ink *some* amount for the equipment

credit.[82]

There are disputes, however, as to how the credit amount should be calculated.

First, Flint Ink asserts that the "actual net purchases" from Flint Ink through October

of 2005 equaled $1,556,934.00, or 28.3 percent of the $5,500,000.00 contemplated

under the Supply Agreement.[83]  Colormasters calculated the "actual net purchases"

only through May of 2005, and reached a total of $1,270,000.00, or 23.1 percent of

the $5,500,000.00 contemplated under the Supply Agreement.[84]

Regardless of which percent figure is used, the method of calculation also is

in dispute.  Flint Ink asserts that the "non-depreciated portion" of the equipment

---

[81]Supply Agreement, at § 4.2(B) (emphasis supplied).

[82]*See* plaintiff's brief, at 29 (disputing only the method of calculating damages, not the fact
that the equipment credit is owed).

[83]*See* defendant's initial brief, at 28; *see also* Fryer Deposition, at 47.

[84]Fryer Deposition, at 50-51.

credit, to which it is entitled, is equal to the percentage of the $5,500,000.00 of ink that *was not purchased* under the Agreement.  In other words, Colormasters *did not purchase* 71.7 percent of the $5,500,000.00 contemplated under the Supply Agreement.  Therefore, Flint Ink claims that it is entitled to 71.7 percent of the $175,000.00 equipment credit, or $125,475.00.  Flint Ink's interpretation of the equipment credit provision is reasonable.  If Flint Ink did not receive 71.7 percent of the $5,500,000.00 in sales it expected from Colormasters when it issued Colormasters the equipment credit, it is reasonable for Flint Ink to expect to be reimbursed for 71.7 percent of the credit amount.

Colormasters offers an alternative interpretation of the equipment credit provision.  Colormasters contends it is only required to repay a percentage of the equipment credit equal to the percentage of the $5,500,000.00 of ink that it *did purchase* from Flint Ink under the Supply Agreement.  In other words, Colormasters offers to repay only 23.1 percent of the equipment credit.  Flint Ink points out that this interpretation of the Supply Agreement leads to an oddity, *i.e.,* "the way in which Colormasters reads the Agreement suggests that the more it purchased from Flint, the more it would owe on the equipment credit."  The court agrees that it is questionable why Colormasters would bargain for this result.   Nonetheless, Colormasters' interpretation is consistent with the plain language of the equipment credit provision

itself.  The provision directs the parties to calculate the net purchases of ink "as a percentage of the minimum Five million five hundred thousand dollar requirement of" the Agreement.   In the very next sentence, the provision mandates that "Colormasters will repay an amount equal to *the same percentage* of the one hundred seventy five thousand dollar equipment credit."  It is reasonable to read this sentence, in conjunction with the one immediately preceding it, to mean that, if Colormasters purchased 23.1 percent of the $5,500,000.00 of ink specified in the Agreement, then Colormasters is required to pay back 23.1 percent of the equipment credit.

Thus, there are two plausible interpretations of the provision in the Supply Agreement that dictates the manner in which the equipment credit is calculated. Indeed, even Ruben Fryer, Colormasters' controller, testified that for purposes of Colormasters' internal discussions, he prepared the calculation according to both interpretations.[85]  Accordingly, the court concludes that a genuine issue of material fact exists with regard to Flint Ink's damages on the aspect of its breach of contract counterclaim seeking reimbursement of a portion of the equipment credit it issued to Colormasters.  Summary judgment is due to be denied on that claim.

### PART FIVE

*Conclusion*

---

[85]Fryer Deposition, at 46-53.

Based on the foregoing, defendant's motion for summary judgment on all of plaintiff's claims is due to be granted.  Defendant's motion for summary judgment on its counterclaim is due to be granted as to defendant's claim for recovery on unpaid invoices, but denied as to defendant's claim for recovery of a portion of the equipment credit.  An appropriate order will be entered contemporaneously herewith.

DONE this 11th day of September, 2007.

_____
United States District Judge